1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDON L. SHERMAN, | CASE NO. 1:09-cv-00420-LJO-GBC (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT |
| v. | |
| F. GONZALES, et al., | |
| Defendants. | (Docs. 50, 66) |
| _____/ | |

## I.     Procedural and Factual Background

### A.     Procedural History

Plaintiff, Brandon L. Sherman,[1] ("Plaintiff") is a state prisoner proceeding pro se in this civil rights action pursuant to 42 U.S.C. § 1983.  This action is proceeding against Defendants Martinez, Pinkerton, Rivera, Rocha and Walker.  (Docs. 13, 16, 18).  On November 12, 2010, Plaintiff filed a motion for injunctive relief.  (Doc. 38).  On February 4, 2011, Plaintiff filed a motion for summary judgment.  (Doc. 50).  Defendants did not file an opposition.  Rather, On February 16, 2011, Defendants filed a motion pursuant Rule 56(d) of the Federal Rules of Civil Procedure to stay Plaintiff's motion for summary Judgment.  (Doc. 51).  The Court granted  Defendants' Rule 56(d) motion.  (Doc. 61).  On July 21, 2011, the Defendants filed a cross-motion for summary judgment

---

[1] In their cross-motion for summary judgment, Defendants assert that Plaintiff's true name is Sherman Brandon.  (Doc. 66).  Neither side has produced any documentation to demonstrate Plaintiff's true name, however, in Plaintiff's opposition documents, he has retitled them as "Sherman L. Brandon."

and opposition to Plaintiff's motion for summary.  (Doc. 66).  On August 19, 2011, Plaintiff filed an opposition.  (Docs. 71, 72, 73, 74).  On August 26, 2011, Defendants filed a reply.  (Doc. 79).

### B.   Factual Background

Following facts are undisputed or read in the light most favorable to Plaintiff.  Plaintiff is in the custody of the California Department of Corrections and Rehabilitation and is incarcerated at Kern Valley State Prison in Delano, California ("KVSP").  The events in his complaint took placed when Plaintiff was incarcerated at California Correctional Institution in Tehachapi, California ("CCI-Tehachapi").  (Doc. 1).  This action is proceeding on Plaintiff's original complaint, filed March 5, 2009, against Defendants Rivera, Walker, Rocha, Pinkerton, and Martinez ("Defendants") for violation of the Eighth Amendment.  (Docs. 11, 13, 18).

On July 10, 2007, one or more toilets on Plaintiff's floor overflowed and sewage water began to seep into Plaintiff's cell.  (Doc. 1; Docs. 66-7, 66-8, 66-9, 66-11 (Declarations of Defendants Walker, Rocha, Rivera and Pinkerton (Decls. at ¶ 3)).  After a prolonged time in his cell with the stench of sewage, Defendant Walker approached Plaintiff's cell and asked if Plaintiff was alright. (Doc. 1; Doc. 66-4 at 33-34, 35-36 (Pltf.'s Dep. 36:6-37:21; 42:9-43:14)).  After Plaintiff indicated that he was not well, Defendant Rocha ordered Defendant Pinkerton to open Plaintiff's cell and Plaintiff was carried by Defendants Rocha and Walker to a bench and medical staff arrived with a wheelchair and took Plaintiff to the clinic.  (Doc. 1; Doc. 66-4 at 36-37, 42 (Pltf.'s Dep. 43:21-44:6; 49:2-11)).  Plaintiff was taken to an off-site hospital, Tehachapi Valley Healthcare District, for emergency treatment.  (Doc. 1; Doc. 66-4 at 36-37, 42 (Pltf.'s Dep. 43:21-44:6; 49:2-11)).  Plaintiff was released from Tehachapi Hospital the next day on July 11, 2007, at 9:30 a.m.  (Doc. 66-1 at 9 (Def. Cross Mot. Sum Judg. "CMSJ"); Doc. 66-5 (Dr. Chen Decl. ¶ 5 & Def. Exs. 6-7)).  That same morning, Plaintiff was seen in the clinic before being released to his cell.  Doc. 66-5 (Dr. Chen Decl. ¶ 5 & Def. Ex. 8)).  After entering his cell, Plaintiff remarked that the cell "stunk" and that he was

sick again and was immediately returned to get medical attention.  (Doc. 66-6 (Martinez Decl. ¶ 5); Doc. 66-4 at 46-47 (Pl.'s Dep. 61:25-62:9).

Plaintiff was released from Lancaster Community hospital on July 11, 2007, at 4:30 p.m. and was then seen at the clinic at 6:25 p.m.  (Doc. 66-5 (Dr. Chen Decl. ¶ 5 & Def. Ex. 13).  At 8:00 p.m., Plaintiff was admitted to the Outpatient Housing Unit (OHU) and was discharged the following morning.  (Doc. 66-5 at 7 (Dr. Chen Decl. ¶ 5 & Def. Exs. 14-15).  On July 12, 2007, at 4:10 p.m. while in a holding cell, Plaintiff stated that he "felt closed in" and reported to have had a third asthma attack.  (Doc. 66-5 (Dr. Chen Decl. ¶ 5 & Def. Ex. 16).  Plaintiff was immediately taken to the clinic and at 5:00 p.m. Plaintiff was transported to Lancaster Community Hospital and at 6:24 p.m., Plaintiff was discharged.  (Doc. 66-5 (Dr. Chen Decl. ¶ 5 & Def. Exs. 16-18, 20).  After an order was made at 8:30 p.m. to place Plaintiff in the Outpatient Housing Unit, Plaintiff was admitted to the Outpatient Housing Unit at 10:20 p.m.  (Doc. 66-5 (Dr. Chen Decl. ¶ 5 & Def. Exs. 20-22).  On the morning of July 13, 2007, Plaintiff was discharged to the yard.  (Doc. 66-5 (Dr. Chen Decl. ¶ 5 & Def. Ex. 25).

### C.    Plaintiff's Allegations in Amended Complaint

According to Plaintiff, On July 10, 2007, Plaintiff's cell was flooded with sewage, which spread throughout the entire housing tier.  (Doc. 1 at 7).  Plaintiff claims that correctional officers ran out of the building and left all the prisoners in their cells without checking to see if any of the prisoners needed medical attention.  (Doc. 1 at 7).  Plaintiff alleges that he was locked in his cell for approximately five hours without fresh water while suffering from the stench of human excrement.  (Doc. 1 at 8).  As a result, Plaintiff suffered from a severe asthma attack and severe vomiting.  (Doc. 1 at 8, 14 ).  Defendants Walker, Rocha, and Pinkerton were on-site.  (Doc. 1 at 8).  After five hours, Defendant Walker approached Plaintiff's cell door and asked if he was alright.  (Doc. 1 at 8).  Plaintiff shook his head 'no,' and Defendant Rocha approached Plaintiff's cell and ordered

Defendant Pinkerton to open it. (Doc. 1 at 8). Plaintiff was carried by Defendants Rocha and Walker to a bench and medical staff was contacted to send Plaintiff to the clinic. Plaintiff was treated with oxygen and an I.V. was placed in his arm. (Doc. 1 at 8).

Plaintiff was taken to an off-site hospital, Tehachapi Valley Healthcare District, for emergency treatment. (Doc. 1 at 8). Plaintiff's heart stopped at one point. (Doc. 1 at 8, 14). Plaintiff also had a tube placed into his penis to enable urination. (Doc. 1 at 8). Plaintiff further alleges that his blood was "contaminated" had to be "drained [and] cleaned." (Doc. 1 at 11, 14). Plaintiff's doctor at Tehachapi Valley Healthcare District, Dr. Barrozo, discharged Plaintiff, sending him back to CCI-Tehachapi. (Doc. 1 at 13). When Plaintiff returned to CCI-Tehachapi, he was housed in the prison infirmary. (Doc. 1 at 8). Dr. Hirsch at CCI-Tehachapi ordered building staff to place Plaintiff in a clean cell. (Doc. 1 at 8). However, on July 11, 2007, Plaintiff was placed in the same contaminated cell, which caused another severe asthma attack and he began vomiting violently. (Doc 1 at 8-9). Plaintiff alleges that Defendants Martinez and Rivera intentionally refused to comply with Dr. Hirsch's medical order to clean up his cell. (Doc. 1 at 9).

## II.   Legal Standards

### A.   Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party:

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id*. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record they wish the Court to consider. *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031

(9th Cir. 2001).  The Court will not mine the record for triable issues of fact.  *Id.*

**B.     Eighth Amendment Deliberate Indifference of a Serious Medical Need**

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  The two part test for deliberate indifference requires Plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted) quoting *Estelle*, 429 U.S. at 104).  Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." *Id.* (citing *McGuckin*, 974 F.2d at 1060).  A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837).  "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.* (quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002)).  "[A]n 'inadvertent [or negligent] failure to provide adequate medical care' alone" is insufficient to state a claim, and an isolated incident when compared to overall treatment "'ordinarily militates against a finding of deliberate indifference.'" *Jett*, 439 F.3d

at 1096 (quoting *McGuckin*, 974 F.2d at 1060 (internal quotations and citations omitted)).

**III.      Summary Judgment Motions, Objections and Replies**

    **A.      Plaintiff's Motion for Summary Judgment**

Plaintiff reasserts that on the initial day of the sewage flooding that Defendants abandoned the prisoners to remain in the sewage. (Doc. 50 at 24). Plaintiff submits as evidence his declaration stating that there was a flood of raw sewage and that inmates had to sit in the conditions for five hours. (Doc. 50 at 38-39).

Plaintiff argues that when Dr. Hirsch ordered for Plaintiff to be relocated in a different cell away from the sewage fumes, that Defendants were placed on notice that Plaintiff had a serious medical need and had deliberately chose to ignore the doctor's order to address that need. (Doc. 50 at 21-22). In his sworn declaration, Plaintiff states that on July 12, 2007, he was returned to the 4A facility 5C-109 and that the waste was still not cleaned up and the air was filled with noxious fumes. (Doc. 50 at 39). Plaintiff concludes that the raw sewage fumes caused a life threatening asthma attack and thus his medical needs on July 12, 2007, entailed being housed in a different cell. (Doc. 50 at 22).

Plaintiff submits several medical reports without any supporting doctor's declaration explaining the significance of such reports. Plaintiff, for example, submits a "pre-registration sheet" from Tehachapi Valley Healthcare district, dated July 10, 2007, which is supposed to be a patient self reporting document. (Doc. 50 at 44). The pre-registration sheet indicates that Plaintiff was unable to sign and that Plaintiff was "unresponsive - asthma." (Doc. 50 at 44). Plaintiff also submits a lab report dated July 10, 2007, without any doctor's declaration explaining the significance of the data in the report. (Doc. 50 at 46).[2] Plaintiff submits an additional form dated July 7, 2007, that states the chief complaint is acute asthma and circled "wheezing" and "severe distress" in the respiratory section of the assessment. (Doc. 50 at 47). On Plaintiff's discharge documents from Tehachapi Valley Healthcare District, the document states that on July 11, 2007, Plaintiff "was

---

[2] For example, an excerpt from the lab report states that his: 1) PH level was 7.41; 2) pCO2 level was 33 mmHg; 3) pO2 level was 121 mmHg; 4) Na+ level was 137 mmol/L; 5) HCO3- level was 20.9 mmol/L; 6) BE (B) level was -3.0 mmol/L and 7) SO2c level was at 99%. (Doc. 50 at 46).

treated in the Emergency Department . . . for acute asthma attack/pseudoseizures." Doc. 50 at 50. On an admission assessment dated July 12, 2007, it states that Plaintiff fell off a gurney in 4A while having an asthma attack. (Doc. 50 at 66-67). Plaintiff asserts that a document dated July 12, 2007, and labeled "interdisciplinary progress notes" is Dr. Hirsch's order with the second to last line ordering that upon discharge Plaintiff should have different cell without sewage and fumes. (Doc. 50 at 11 (Pltf's Undisputed Facts); Doc. 50 at 56 (Pltf's Ex. A12)).

Plaintiff asserts that the failure to place Plaintiff in a different cell on July 12, 2007, caused a second life threatening acute asthma attack, excruciating vomiting and falling of the gurney while suffering from the asthma attack. (Doc. 50 at 22). Plaintiff also submits administrative documents relating to the Defendants' work schedule and log book. (Doc. 50 at 79-95). Plaintiff asserts in his "Undisputed Facts" that the Defendants' work log dated Monday July 9, 2007, demonstrates that Plaintiff was returned the exact cell (Unit 5C-109) on July 12, 2007. (Doc. 50 at 12 (Pltf's Undisputed Facts); Doc. 50 at 80 (Pltf's Ex. B1)).

Plaintiff also submits Defendants' admissions and responses to interrogatories. (Doc. 50 at 101). Plaintiff cites to interrogatories that confirm that Plaintiff was housed on the 4A facility cell 5C-109 on July 10, 2007, that Plaintiff's cell was flooded and that he was returned there on July 12, 2007. (Doc. 50 at 14 (Pltf's Undisputed Facts); Doc. 50 at  (Pltf's Ex. C)). Plaintiff cites to the interrogatory number 22 of Defendant Rivera, where Plaintiff asks "[a]fter being transported to the medical department and receiving emergency medical treatment . . . was Plaintiff placed back inside his same sewage contaminated prison cell." (Doc. 50 at 15 (Pltf's Undisputed Facts); (Doc. 50 at 114 (Pltf's Ex. C)). In response Defendant Rivera stated "Defendant objects that this request . . . assumes facts not in evidence. Without waiving this objection, Defendant responds as follows: After reviewing all documents available to him, Plaintiff was placed back into Housing Unit 5-C-109." (Doc. 50 at 114 (Pltf's Ex. C). Additionally, Plaintiff cites to the interrogatory number 24 of Defendant Martinez, where Plaintiff asks "[o]n July 10, 2007 during aforsaid [sic] Building #5 sewage flooding, did you evacuate the inmates from the Building away from the contaminated water, human feces and bad fumes." (Doc. 50 at 16 (Pltf's Undisputed Facts); (Doc. 50 at 107 (Pltf's Ex.

C)).  In response Defendant Martinez stated "Defendant objects that this request . . . assumes facts not in evidence. Without waiving this objection, Defendant responds as follows: Defendant recalls that Plaintiff's was the only cell that was contaminated. Based on this, there was no need to evacuate the housing unit."  (Doc. 50 at 107 (Pltf's Ex. C).  Plaintiff cites to the Defendants' answer number 15, where Plaintiff asks ". . . after Plaintiff received emergency medical treatment the Plaintiff was returned to the exact same prison cell which caused his asthma attack?"  (Doc. 50 at 16 (Pltf's Undisputed Facts); (Doc. 50 at 147 (Pltf's Ex. C)).  In response Defendants state in their relative answers "Defendant, after making reasonable inquiry, lacks sufficient knowledge and information to admit or deny this request. Defense counsel has reviewed Plaintiff's movement records, and admits that the records show Plaintiff was house in Housing Unit 5-c-190."  (Doc. 50 at 147 (Pltf's Ex. C).

     **B.**     **Defendants' Opposition and Cross Motion for Summary Judgment**[3]

          **1.**     **Knowledge of Harm**

Defendants assert that Walker, Rocha and Pinkerton did not know that Plaintiff's cell was affected by the sewage flood and that they did not know that Plaintiff was suffering an asthma attack. (Doc. 66-1 at 10).  Although Plaintiff's cell was not made of bars, Defendants argue that Plaintiff could have attempted to get help through the small window on his metal door.  As evidence, Defendants cite to Plaintiff's Deposition.  (Doc. 66-4, Pltf.'s Dep. at 24:9-24:13; 25:15-27:16). Defendants state that rather than signal officers for help, Plaintiff used a towel to push the sewage water through the crack under the door and out of his cell and then sat on his bed.  As evidence, Defendants cite to Plaintiff's Deposition and Plaintiff's Complaint.  (Doc. 1 at ¶ 18; Doc. 66-4, Pltf.'s Dep. at 31:1-31:15; 34:11-36:10; 44:7-46:11).  Defendants further assert that since Plaintiff's cell has a solid metal door with a small window, Plaintiff could only see some stairs and a shower and admits that he did not see officers fleeing the building as a result of the sewage backup.  (Doc.

---

[3] The Court will summarize Plaintiff's Opposition to the extent that such summary provides new information or argument.

66-1 at 11).  As evidence, Defendants cite to Plaintiff's Deposition.  (Doc. 66-4, Pltf.'s Dep. at 24:9-24:13; 25:15-27:16).

## 2.      Defendants' Response Once Harm was Known

Contrary to Plaintiff's allegation in his complaint that Defendants abandoned the building when the sewage flooding occurred, Defendants assert that as soon as the sewage flood came to the attention of Defendant Walker, he immediately called maintenance staff to fix the problem.  (Doc. 66-1 at 11).   As evidence, Defendants cite to the declarations of Walker, Rocha, Rivera and Pinkerton and Plaintiff's deposition stating that he had 'no clue' what the Defendants were doing during when the toilets flooded.  (Doc. 66-11, Walker Decl. ¶¶ 3-4; Doc. 66-9, Rocha Decl. ¶ 4; Doc. 66-8, Rivera Decl. ¶ 4; Doc. 66-7, Pinkerton Decl. ¶ 4; Doc. 66-4, Pltf.'s Dep. at 52:15-52:24). According to Defendants, the 11:30 a.m. count on July 10, 2007, was when Plaintiff first indicated to Defendant Walker that he was not well and upon discovering Plaintiff's condition, Defendant Walker immediately got Defendant Rocha and Control Booth Officer, Defendant Pinkerton opened the cell door.  (Doc. 66-1 at 11).  As evidence, Defendants cite to Plaintiff's complaint and Plaintiff's deposition.  (Doc. 1 ¶ 18; Doc. 66-4, Pltf.'s Dep. at 33:6-37:21; 42:9-43:14; 43:21-44:6; 49:2-49:11). Plaintiff was then immediately taken to the clinic to receive medical attention.  (Doc. 66-1 at 11). As evidence, Defendants cite to Plaintiff's complaint and deposition.  (Doc. 1 ¶ 18; Doc. 66-4, Pltf.'s Dep. at 43:21-44:6; 49:2-49:11).

Defendants assert that on July 11, 2007, Plaintiff was not left in a contaminated cell.  (Doc. 66-1 at 11).  As evidence, Defendants cite to the declarations of Defendants Martinez and Walker as well as Plaintiff's deposition.  (Doc. 66-11, Walker Decl. ¶ 5; Doc. 66-6, Martinez Decl. ¶¶ 4-5; Doc. 66-4, Pltf.'s Dep. at 61:25-62:9).  Defendants claim that when Defendant Martinez attempted to place Plaintiff in his cell, before the door had closed, that Plaintiff indicated that he was ill again and Plaintiff was immediately taken back to the clinic to receive medical attention.  (Doc. 66-1 at 11-12).  As evidence, Defendants cite to Defendant Martinez's declaration and Plaintiff's deposition. (Doc. 66-6, Martinez Decl. ¶ 5; Doc. 66-4, Pltf.'s Dep. at 61:25-62:9).

Defendants also argue that Plaintiff contradicts his claims that he was returned to a contaminated cell since on July 11, 2007, Plaintiff told the doctor: "They are cleaning up housing five. The fumes got to me." (Doc. 66-1 at 11-12). As evidence, Defendants cite to Dr. Chen's declaration and Defendants' exhibit 13. (Doc. 66-5, Dr. Chen Decl. ¶ 5, Ex. 13). Additionally, Defendants argue that although they cannot recall whether they personally cleaned Plaintiff's cell since prisoners flooding their cells is a common occurrence, Defendants assert that after a toilet overflows, it is customary for officers to hose out and squeegee any affected areas. (Doc. 66-1 at 12). As evidence, Defendants cite to the declarations of Walker and Martinez. (Doc. 66-11, Walker Decl. ¶ 5; Doc. 66-6, Martinez Decl. ¶ 4). Defendant Martinez also asserts in her declaration that she knows that she would not have placed Plaintiff or any other inmate in a flooded cell or a cell with feces on the floor. (Doc. 66-1 at 12; Doc. 66-6, Martinez Decl. ¶¶ 4-5).

Further, Defendants argue that although Plaintiff claims that Martinez and Rivera disobeyed orders from Plaintiff's doctor and placed him in a still contaminated cell on July 12, 2007, which caused Plaintiff's second asthma attack, Defendants Martinez and Rivera returned Plaintiff to his cell on July 11, 2007, the day before Dr. Hirsch issued his order on July 12, 2007. (Doc. 66-1 at 12). As evidence, Defendants cite to Plaintiff's exhibit A12, Martinez's declaration and Dr. Chen's declaration. (Doc. 50 at 56 (Pltf's Ex. A12); Doc. 66-6, Martinez Decl. ¶ 5; Doc. 66-5, Dr. Chen Decl. ¶ 5 & Exs. 8-9, 15).

### 3.    Seriousness of Medical Harm

Defendants argue that "Based on medical records showing [Plaintiff's] SpO2 levels, respiratory rates, CO2 levels, blood gas readings, diagnosis of pseudoseizures, and mental health history, it is extremely unlikely, if not impossible, that [Plaintiff] actually suffered severe asthma attacks July 10-12, 2007." (Doc. 66-1 at 13; Doc. 66-5, Dr. Chen's declaration, *passim* & Exs. 26-29). According to the Defendants' expert witness, Dr. Chen,[4] during an asthma attack,

---

[4] Federal Rule of Evidence 702 permits expert testimony if the expert is qualified, the expert's testimony provides "scientific, technical, or other specialized knowledge" to assist the trier of fact, and the expert's testimony is reliable. Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1)

bronchospasm, inflammation, and mucus production obstruct the airflow through the bronchi and thus decreases oxygen intake. (Doc. 66-1 at 13-14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(a)). Dr. Chen explains that a patient experiencing a serve asthma attack will always exhibit an abnormally low SpO2 level. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(a)). After reviewing Plaintiff's medical records, Dr. Chen concludes that Plaintiff's SpO2 levels recorded between July 10 and 12, 2007, were in the normal range, and were often 100%. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(a) & at Ex. 1-3, 6, 8-10, 13, 16-17, 19)).

Further, Dr. Chen explains, that during an asthma attack, as the body becomes starved for oxygen, the area of the brain forming the respiration regulatory center will cause the respiratory rate (RR) to increase. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(b)). According to Dr. Chen, a severe asthma attack will cause a rapid RR (.35 bpm) and Plaintiff's recorded RR between July 10-12, 2007, was in the normal range. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(b) & at Ex. 2- 3, 9-10, 13, 16-17, 19)). Dr. Chen also explains that during a severe asthma attack, the patient's CO2 level will rise because normal respiration is obstructed and Plaintiff's CO2 level was normal (33 mmHg). (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(c) & at Ex. 4)).

According to Dr. Chen, during a severe asthma attack, as the CO2 level starts to rise, the pH will drop (respiratory acidosis). (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(d)). Moreover, Dr. Chen explains that in the later stages of respiratory acidosis, Bicarbonate (HCO3) is released into the blood by the kidneys to compensate for respiratory acidosis. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(d)). From reviewing the medical records, Dr. Chen concludes that Plaintiff's blood pH was 7.41 was normal and that Plaintiff's HCO3 level (20.9 mmol/L) was normal, thus Plaintiff did not have respiratory acidosis. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(d) & at Ex. 4)). Dr. Chen states in his declaration that if the asthma patient's breathing slows down too

the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Based on Dr. Chen's curriculum vitae detailing his extensive experience as a medical doctor and given the voluminous medical record upon which Dr. Chen is basing his opinions on, the Court concludes that Dr. Chen has sufficiently demonstrated his qualifications to serve as an expert witness for the purposes of Defendants' cross-motion for summary judgment. *See* Fed.R.Evid. 702 & 703.

much or stops, the pO2 will drop which is referred to as hypoxemia. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(d)). Dr. Chen concludes that although Plaintiff's pO2 level (121 mmHg.) was actually somewhat higher than normal; he did not suffer from hypoxemia. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(d) & at Ex. 4)). From the abovementioned indicators, Dr. Chen concludes that Plaintiff's blood gas readings indicate that he was not suffering a serve asthma attack. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(d) & at Ex. 1-3, 6, 8-10, 13, 16-17, 19)).

Dr. Chen points out that the medical staff at Tehachapi Hospital diagnosed Plaintiff as having pseudoseizures. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(e) & at Ex. 6-7)). Dr. Chen opines that the diagnosis of pseudoseizures indicates a psychosomatic component to the incident. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(e)). Dr. Chen explains that pseudoseizures are a physical manifestation of an emotional disturbance and that although pseudoseizures resemble epileptic seizures, they are not caused by electrical disruptions in the brain as in seizures caused by epilepsy. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(e)). Dr. Chen states that pseudoseizures are psychological defense mechanisms, and may be brought on by episodes of severe stress or emotional trauma. (Doc. 66-1 at 14; Doc. 66-5 (Dr. Chen Decl. at ¶ 4(e).

### 4.      Qualified Immunity

Based on the same facts and arguments above detailing the Defendants' lack of knowledge of Plaintiff's condition and Defendants' immediate and extensive response upon discovering Plaintiff's medical condition, Defendants argues that they are entitled to qualified immunity. (Doc. at 16-17).[5]

### C.      Plaintiff's Opposition/Reply to Defendants' Cross-Motion for Summary Judgment

In Plaintiff's opposition documents, Plaintiff reasserts his original allegations and attempts to justify why various facts are disputed. (Docs. 71, 72, 73, 74). Plaintiff reiterates that Defendants abandoned their positions during the sewage flooding. (Doc. 73 at 6). Plaintiff attempts to interpret

---

[5] The Court will not repeat the same facts and arguments since they are already detailed above.

the medical records and make arguments based on his interpretations.  (Doc. 72).  Plaintiff asserts that on July 12, 2007, he was placed in the same exact cell that had caused the initial "acute life threatening asthma attack."  (Doc. 72 at 4; Doc. 73 at 6).  Plaintiff also disputes facts but fails to show the relevance of certain arguments and other arguments do not support his claim.  (Doc. 72 at 7).  For example, Plaintiff states that "[Plaintiff] asked Defendants if they had provided Brandon with uncontaminated drinking water at any time. Defendants confess that only water coming from the toilet was contaminated."  (Doc. 72 at 7).  Such a "confession" that toilet water is contaminated does not further Plaintiff's claims.  Also, Plaintiff has submitted a document where he lists Plaintiff's proposed undisputed facts and simply responds to many of the facts as "'Disputed' not true" or attempts to give a different interpretation of the medical records.  (Doc. 71 at 1-7).  Plaintiff also lists what he believes Defendants cannot prove such as: 1) "Defendants cannot prove that Plaintiff was not housed in the same contaminated cell after being treated for an asthma attack"; 2) "Defendants cannot prove that they had cleaned and sanitized Plaintiff's cell before placing Plaintiff back inside"; or 3) "Defendants cannot prove that Plaintiff's skin was not pale or his skin temperature was not cool, or that Plaintiff's lung sounds was [sic] diminished."  (Doc. 74 at 3).  Plaintiff also asserts that Defendants did not hose or sanitize his prison cell before allowing him to re-enter.  (Doc. 73 at 6).

Plaintiff seems to think that Defendants' expert witness, Dr. Chen's 'opinions' are not relevant and argues that "Dr. Chen uses his 'opinion' quite often in his declaration that's not substantiated by proof. . . . [and] Defendants cannot speak for the physicians that have diagnosed Plaintiff with having an asthma attack."  (Doc. 74 at 3).  Plaintiff asserts that "[a]lthough Defendants had hired a doctor to state his opinion, it does not hide the opinion or over-ride the diagnosis made by the physicians hired by the Department of Corrections. . . ."  (Doc. 73 at 7).  However, Plaintiff also concedes in his declaration that "Plaintiff is not a licensed physician and has never studied medicine, psychology, or any other study that involves the human body. Plaintiff is unable to present facts essential to justify the opposition of M.D. Chung-Kwang Chen's opinions due to having no resources to contest Dr. Chen's opinions."  (Doc. 73 at 1-2).

1

2

### D.      Defendants' Reply[6]

3

Overall, Defendants reassert the same arguments as they did in their initial motion for

4

summary judgment. (Doc. 79). Defendants argue that Plaintiff admits that he does not know his

5

medical or mental history. (Doc. 79 at 2). Defendants correctly point out that although Plaintiff

6

asserts that Defendants abandoned their posts, Plaintiff does not present any contrary evidence to

7

refute his deposition where he conceded that he could not see what the Defendants were doing during

8

the sewage flooding. (Doc. 79 at 3). Defendants also argue that Plaintiff was capable of cleaning

9

his own cell. (Doc. 79 at 3).

10

11

### IV.     Analysis

12

In order for Plaintiff to prevail in the summary judgment motions, Plaintiff needs to establish

13

that there is: 1) a serious medical need; and 2) that the Defendants' response to the need was

14

deliberately indifferent. *Jett*, 439 F.3d at 1096. Defendants have provided extensive evidence in the

15

form of their expert witness Dr. Chen's declaration based on several medical records submitted as

16

exhibits to demonstrate that even if Plaintiff demonstrated a medical need, it was not serious. (Doc.

17

66-5, Dr. Chen's declaration, *passim* & Exs. 26-29). After reviewing Plaintiff's medical records,

18

Dr. Chen concludes that the various testing indicators such as $CO_2$, $HCO_3$, $SpO_2$ levels and

19

respiratory rate were normal and did not indicate the existence of a severe asthma attack. (Doc. 66-5,

20

Dr. Chen's declaration, *passim* & Exs. 26-29). Moreover, Dr. Chen explains that Plaintiff's

21

diagnosis of pseudoseizures reflects a physical manifestation of an emotional disturbance and are

22

not caused by electrical disruptions in the brain as in seizures caused by epilepsy. (Doc. 66-5 (Dr.

23

Chen Decl. at ¶ 4(e)). Plaintiff fails to demonstrate that his medical need was sufficiently serious

24

to prevail in the section 1983 claim. Therefore, Plaintiff fails to meet the objective prong of the

25

26

27

28

---

[6] The Court will summarize Defendants' Reply to the extent that such summary provides new information or argument.

deliberate indifference standard.

Secondly, Plaintiff must prove that deliberate indifference existed by demonstrating that Defendants purposefully failed to respond to Plaintiff's medical need.  "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." *Jett*, 439 F.3d at 1096.  Defendants do not act in a deliberately indifferent manner unless they "know[] of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837).  "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.* (quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002)).  In this instance Defendants have demonstrated that they did not know of Plaintiff's medical condition until Plaintiff informed one of the Defendants at the 11:30 a.m. check and therefore, Plaintiff's fails to demonstrate that the Defendants knew of Plaintiff's medical condition in order to be deliberately indifferent to it. *See Farmer*, 511 U.S. at 837; *Frost v. Agnos*, 152 F.3d 1124, 1129-30 (9th Cir.1998).  Once Defendants were made aware of Plaintiff's condition, Defendants ensured that Plaintiff received immediate medical attention.

Contrary to Plaintiff's argument that Defendants ignored Dr. Hirsch's order to not place Plaintiff in a contaminated cell, Dr. Hirsch's order was made after Defendants returned Plaintiff to his cell on July 11, 2007.  (Doc. 50 at 56 (Pltf's Ex. A12); Doc. 66-6, Martinez Decl. ¶ 5; Doc. 66-5, Dr. Chen Decl. ¶ 5 & Exs. 8-9, 15).  Moreover, even when Defendants did return Plaintiff to his cell, the door did not close before Plaintiff indicated that he needed emergency medical treatment again and was returned to the clinic.  (Doc. 66-6, Martinez Decl. ¶ 5; Doc. 66-5, Dr. Chen Decl. ¶ 5 & Exs.

8-9, 15).

Based on the above analysis, Plaintiff fails to demonstrate that there exist any genuine issue as to any material fact and Plaintiff fails to demonstrate that the requisite elements for a deliberate indifference claim is met.

## V.    Preliminary Injunction

In Plaintiff's motion for preliminary injunctive relief he states that on October 23, 2010, he was retaliated against by being framed with a contraband weapon and that on a daily basis prison staff is retaliating against him as a result of his litigating actions in court.  (Doc. 38 at 2).  Plaintiff requests for the Court to: 1) send out someone to investigate the acts of retaliation that Plaintiff alleges is occurring; 2) give Plaintiff security; 3) order the Warden to return his legal materials; 4) that his typewriter be found or a new typewriter be provided to him; 5) to be transferred to another prison; 6) notify the California Attorney General of the retaliation; 7) be allowed to file harassment charges; 8) ensure that his legal mail is delivered in a timely fashion; and 9) that Plaintiff remains in a single cell status.

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right."  *Winter v. Natural Resources Defense Council, Inc*., 129 S.Ct. 365, 376 (2008) (citation omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 374 (citations omitted).  An injunction may only be awarded upon a clear showing that the plaintiff is entitled to relief. *Id*. at 376 (citation omitted)(emphasis added).  The Ninth Circuit has made clear that "[T]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable.*" McDermott v. Ampersand*

*Pub., LLC*, 593 F.3d 950 (9th Cir. 2010), quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  The moving party has the burden of proof on each element of the test.  *Environmental Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

A federal court is a court of limited jurisdiction.  Because of this limited jurisdiction, as a threshold and preliminary matter the court must have before it for consideration a "case" or "controversy."  *Flast v. Cohen*, 392 U.S. 83, 88 (1968).  If the court does not have a "case" or "controversy" before it, it has no power to hear the matter in question.  *Rivera v. Freeman*, 469 F. 2d 1159, 1162-63 (9th Cir. 1972).  "A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court."  *Zepeda v. United States Immigration Service*, 753 F.2d 719, 727 (9th Cir. 1985) (emphasis added).

Plaintiff has not met his burden as the moving party.  "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotations and citations omitted) (emphasis in original).  A *mandatory* preliminary injunction, such as that sought by plaintiff in the instant motion, "is subject to heightened scrutiny and should not be issued unless the facts and the law clearly favor the moving party."  *Dahl v. Hem Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).  As the moving party, it is Plaintiff who bears the burden, and the burden does not shift to defendants unless and until plaintiff's burden has been met.

Since Plaintiff's new allegations of retaliation are not claims in this current action, the Court does not have jurisdiction over the claims and cannot provide injunctive relief.  *See Rivera v. Freeman*, 469 F. 2d 1159, 1162-63 (9th Cir. 1972).  If Plaintiff wishes to pursue

retaliation claims, he needs to file a new action.  Moreover, consistent with the Court's above analysis and conclusion that Defendants' cross-motion for summary judgment should be granted and that this action should be dismissed, to the extent that any of Plaintiff's requests stem from claims in this current action, it is apparent that Plaintiff will not succeed on the merits in this action.  *See Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 374.  Therefore, the Court recommends that Plaintiff's motion for preliminary injunctive relief be denied.

## VI.    Conclusion and Recommendations

Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Plaintiff has the burden of showing that Plaintiff suffered from a serious medical harm, that Defendants knew of this serious medical harm and that even after Defendants knew of the harm, they chose to not take steps to address the harm. *Farmer v. Brennan*, 511 U.S. 825, 837; *Toguchi v. Chung*, 391 F.3d 1051-57; *Jett*, 439 F.3d at 1096. Because Plaintiff has failed to make such a showing, Defendants are entitled to summary judgment. *Celotex*, 477 U.S. at 323.  Since the case is disposed of on the merits, the Court need not address the remaining qualified immunity arguments.  Additionally, as the Court does not have jurisdiction over Plaintiff's new retaliation claim, Plaintiff cannot prevail in his motion for preliminary injunctive relief.

///

///

///

///

For the reasons set forth herein, it is HEREBY RECOMMENDED that:

1.    Plaintiff's motion for summary judgment (Doc. 50), filed February 4, 2011, be DENIED;

2.    Defendants' Cross-Motion for Summary Judgment (Doc. 66), filed July 21, 2011, by Defendants Martinez, Rocha, Pinkerton, Rivera and Walker, be GRANTED;

3.    Plaintiff's motion for preliminary injunctive relief, filed November 12, 2010, be DENIED; and

4.    that the Clerk of the Court be directed to enter judgment for the Defendants Martinez, Rocha, Pinkerton, Rivera and Walker and against Plaintiff.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   October 3, 2011

UNITED STATES MAGISTRATE JUDGE